UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILLIAM LOONEY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TIMBERLAND LODGE, INC., a Washington corporation; et al., <br><br> Defendants. | No. C05-253Z <br><br> ORDER |

Plaintiffs bring the following claims for monetary damages: (1) RICO Act violations under 18 U.S.C. § 1962; (2) Washington State Consumer Protection Act ("CPA") violations under RCW 18.86; and (3) Washington State usury law violations under RCW 18.52. The Court has before it Defendants' motion for summary judgment, docket no. 12, requesting dismissal of Plaintiffs' claims in their entirety. Having reviewed the Defendants' motion, Plaintiffs' response, docket nos. 20 and 21, and Defendants' brief in reply, docket no. 25, the Court enters the following Order.

## BACKGROUND

Plaintiffs assert their claims as current or former owners of property in the Timberlane Lodge Village ("TLV"), located in Skykomish, Washington. All property owners in TLV become members of a homeowners association, defendant Timberlane Lodge, Inc. ("TLI"),

ORDER 1–

which operates as a nonprofit corporation with volunteer officers and directors.  Mach Decl., docket no. 13, at ¶ 2.  In 1996, TLI's membership amended its bylaws to include a late fee of 10% per month, compounded monthly, on the $225.00 annual membership dues charged to members.  Id. at ¶¶ 2, 5, 7.  In 1998 and 1999, defendants Larry Mach and Karen Stubrud became the president and secretary/treasurer of TLI, respectively.  Id. at ¶ 4.  TLI began imposing the 10% per month late fee on delinquent membership dues at some point in 1998 and continued to do so until 2003.  Id. at ¶ 8.

In February 2003, one of the TLV property owners, Michael Kercheval, filed suit in King County District court alleging violations of the CPA and Washington State usury laws. Id. at ¶ 10.  In response to the Kercheval suit, TLI amended its bylaws to provide for a flat late fee of $20.00 per unpaid assessment and interest of .95% per month.  Id. at ¶ 11.  TLI also gave credits or refunds to members who had paid excessive late fees under the 10% per month provision.  Id. at ¶ 12.  Other than the civil RICO claim, Mr. Kercheval's 2003 suit raised the same claims as those at issue in this case.

Three of the plaintiffs in this case, William Looney, Lyle Clark, and Peggy Ann Huggins, bring these claims alleging they assigned their TLV property to TLI as payment for the dues and late fees.  Mr. Looney's lot was not owned personally but, rather, by Federal Asset Recovery, Inc., which Mr. Looney apparently controlled.  Id. at ¶ 13.  Mr. Clark owned four parcels in TLV and quitclaimed two of them to TLV in June 2000.  Id. at Ex. E. Mr. Clark was issued credit for the late fees he paid on the two remaining lots in 2003.  Id. at ¶ 17.  Ms. Huggins has never owned property in TLV.  Id. at ¶ 14.  She claims to be an heir to William McQueen, now deceased, who quitclaimed his TLV property to TLI on January 25, 2001.  Id. at Ex. C.  The remaining individual plaintiffs, Gary and Deelynn Tuthill and Edward and Cynthia Howey, received a credit of $2,041.34 and a refund of $951.37, respectively.  Id. at ¶¶ 15-16.

ORDER  2–

Defendants move for summary judgment dismissal on several grounds. In their motion, Defendants argue that Plaintiffs cannot satisfy the elements of their RICO claims, which is the only basis for federal subject matter jurisdiction. Docket no. 12, at 1-2. The Defendants' motion requests dismissal of the RICO claim on the merits and, additionally, that the Court decline to exercise its discretion to retain the state law claims. In the alternative, the Defendants also move for dismissal of the state law claims because: (1) Plaintiffs cannot satisfy the CPA elements; (2) some of the Plaintiffs lack standing; (3) several of the claims are barred by the statute of limitations; and (4) some of the Plaintiffs are unable to show damages. Id. However, in their reply brief, Defendants now argue that this Court should reach the merits of the state law claims and dismiss them because Plaintiffs offer no factual basis to proceed. Docket no. 25, at 4.

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the opposing party must show that there is a genuine issue of fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must present significant and probative evidence to support its claim or defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

### I.   Plaintiffs' RICO Claims

Defendants argue and Plaintiffs concede that the only provision of the RICO statute potentially applicable to this case is 18 U.S.C. § 1962(c),[1] which states as follows:

---

[1] 18 U.S.C. § 1962(d) relates to RICO conspiracies and may apply if, and only if, the substantive provisions of § 1962(a), (b) or (c) are present.

ORDER 3–

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Defendants contend that Plaintiffs cannot establish the following elements of the RICO claims: (1) an enterprise existed; (2) there was any relation to interstate commerce; (3) there was any pattern of racketeering activity; or (4) there was an "unlawful debt." Defendants are correct. First, the existence of an "enterprise" requires more than the mere showing that a corporation existed. Cheng v. Chen, 80 F.3d 1293, 1300-01 (9th Cir. 1996); Simon v. Value Behavioral Health, Inc., 208 F.3d 1073, 1083-84 (9th Cir. 2000) (requiring plaintiff to show a structure to the defendants' actions beyond the mere racketeering activity itself). Here, Plaintiffs offer no evidence, nor do they allege, that TLI is an "enterprise" structured to engage in racketeering activities. Second, Defendants argue that there is no relation to interstate commerce in this case. The activities in question involve real property and a local homeowners' association, neither of which relate to interstate activity. Plaintiffs' brief in response makes no attempt to explain how they might satisfy the interstate commerce element. Third, the Plaintiffs cite nothing in the definition of "racketeering activity" or "pattern of racketeering activity" to explain how TLI's actions could satisfy that element of a RICO claim, and it appears that none exists. Finally, to the extent Plaintiffs rely on the usury statute to satisfy the "collection of unlawful debt" element, that too is insufficient. Under the RICO definitions, an "unlawful debt" must be incurred either in connection with the business of gambling or the business of lending money or a thing of value at a rate usurious under State or Federal law." 18 U.S.C. § 1961(6)(B). Here, TLI was neither in the business of gambling nor in the business of lending money. Because Plaintiffs cannot show that they satisfy any of the elements discussed above, and make no meaningful attempt to do so, the RICO claims must be dismissed with prejudice.

ORDER  4–

## II. Plaintiffs' State Law Claims

Given that the RICO claims must be dismissed, and those claims form the only basis for federal question jurisdiction, the Court has discretion as to whether it will retain the remaining state law claims. In Brady v. Brown, the Ninth Circuit held that "[t]he decision to retain jurisdiction over state law claims is within the district court's discretion, weighing factors such as economy, convenience, fairness, and comity." 51 F.3d 810, 816 (9th Cir. 1995). In this case, the Court has taken very little action and there are still several months until the February 11, 2006, trial date. Thus, the Court does not have the kind of familiarity with the case that would make retaining jurisdiction more efficient. Also, the RICO claim upon which jurisdiction was based is completely without merit, suggesting Plaintiffs should have recognized that the case was not properly in federal court to begin with. Finally, Plaintiffs accede to the Defendants' original request to have the state law claims dismissed without prejudice if the RICO claim fails. Pl.s' Resp., docket nos. 21-22, at 7. For these reasons, the Court will address only those state law claims that are unquestionably barred as a matter of law. For those claims where issues of material fact remain, as discussed below, the Court will decline to exercise further jurisdiction.

### A. Consumer Protection Act

The elements of a CPA claim include: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) an impact on the public interest; (4) injury to plaintiff's business or property; and (5) causation. Indus. Indem. Co. of the Northwest, Inc. v. Kallevig, 114 Wn.2d 907, 920-21, 792 P.2d 520 (1990). Whether a particular action gives rise to a CPA violation is a question of law. First State Ins. Co. v. Kemper Nat. Ins. Co., 94 Wn. App. 602, 609, 971 P.2d 953 (1999). The CPA is construed liberally to accomplish its purpose of protecting the public and fostering fair and honest competition. Id.

Defendants move to have Plaintiffs' CPA claims dismissed in their entirety for failure to satisfy either the "unfair or deceptive act" element or the "trade or commerce" element.

ORDER  5–

1  First, Defendants argue that there can be no unfair or deceptive act where the late fee was
2  enacted by a vote of the TLI membership and subsequently imposed on TLI members.
3  Second, Defendants argue that the TLI's activities do not involve "trade or commerce,"
4  which is defined as "the sale of assets or services, and any commerce directly or indirectly
5  affecting the people of the state of Washington." RCW 19.86.010(2). For both arguments,
6  Defendants rely on the plain language of the CPA. In response, Plaintiffs rely on their usury
7  claim to establish the first and second CPA elements. The RCW's chapter on usury states as
8  follows: "Entering into or transacting a usurious contract is hereby declared to be an unfair
9  act or practice in the conduct of commerce for the purpose of the application of the consumer
10 protection act." RCW 19.52.036. This statement, Plaintiffs contend, establishes the first two
11 elements of their CPA claim as a matter of law.

12      While Plaintiffs are correct that a valid usury claim would defeat the Defendants'
13 argument as to the first and second CPA elements, it is not clear whether they have a usury
14 claim to assert. To establish usury, a party must show "(1) a *loan or forbearance*, express or
15 implied, of money or other negotiable tender, (2) an understanding between the parties that
16 the principal must be repaid, (3) the exaction of a greater rate of interest than is allowed by
17 law, and (4) an intention to violate the law." Liebergesell v. Evans, 93 Wn.2d 881, 887, 613
18 P.2d 1170 (1980) (emphasis added); RCW 19.52.020(1). Plaintiffs' brief does not explain
19 how the TLI late fee might involve a "loan or forbearance." Within usury law, "forbearance"
20 means "a contractual obligation of a lender or *creditor* to refrain, during a given period of
21 time, from requiring borrower or *debtor* to repay a loan or *debt* due or payable. Whitaker v.
22 Speigel Inc., 95 Wn.2d 664, 669, 637 P.2d 235 (1981) (emphasis in original) (quoting Hafer
23 v. Spaeth, 22 Wn.2d 378, 384, 156 P.2d 408 (1945)). In Whitaker, the plaintiffs purchased
24 goods on credit that included a 19.8% annual interest rate described as a monthly "service
25 charge." 95 Wn.2d at 664. The Washington State Supreme Court held that the State's usury
26 law applied to the Whitaker's revolving line of credit, which was computed monthly upon

ORDER  6–

the unpaid balance. Id. at 670. This case is similar but not identical. Here, the TLI bylaws charge TLI members $225.00 per year, arguably for the services TLI provides to residents of the TLV community. Although it is deemed a "late fee," the 10% monthly fee could be viewed as analogous to the service charge in Whitaker. The parties do not brief this issue and it does not appear that the Washington State courts have addressed it. Thus, it is an open question whether Plaintiffs can establish a usury claim and, thereby, avoid summary judgment dismissal of their CPA claims. While the CPA claims are not necessarily foreclosed, Defendants are correct that several of the individual Plaintiffs' claims must be dismissed.

### 1.   William Looney

Mr. Looney did not own his TLV lot personally but, rather, controlled it through Federal Asset Recovery, Inc., which held title to the property. Mr. Looney does not dispute this fact. The Washington State usury statutes do not apply to corporate entities. RCW 19.52.080 ("Profit and nonprofit corporations...may not plead the defense of usury nor maintain any action thereon or therefor"). Because there can be no usury act violation as to a corporation, Defendants argue that Mr. Looney cannot establish the usury or CPA claims. Mr. Looney's only response is that TLI sent the membership dues invoices to him personally rather than mailing them to the corporation. This argument is without merit. Mr. Looney cites nothing in the case law or usury statutes to support his argument that the corporate exclusion does not apply when the billing records are addressed to the individual who controls the corporation. Consequently, Mr. Looney's state law claims must be dismissed with prejudice.

### 2.   Peggy Ann Huggins

Defendants challenge Ms. Huggins' claims for lack of standing and as barred by the statute of limitations. First, Defendants contend that Ms. Huggins' claims must be dismissed because she has never been a property owner in the TLV community. Ms. Huggins does not

ORDER  7–

deny that she has never owned a TLV lot. Instead, it appears the parties agree that Ms. Huggins is an heir to William McQueen, who quitclaimed his interest in 1.5 lots in the TLV community to TLI on January 25, 2001, as payment for his membership dues and late fees. Defendants argue that Ms. Huggins does not have standing to bring any claim against TLI in her own name, as opposed to the McQueen estate. Defendants are correct that Ms. Huggins is not the real party in interest. See FED. R. CIV. P. 17(a) ("Every action shall be prosecuted in the name of the real party in interest"). While Ms. Huggins may have been able to bring the action in her own name if she was the executor or administrator of the McQueen estate, that fact is not alleged. Id. Second, Defendants argue that Ms. Huggins' state law claims, even if she were able to assert them, are barred by the statute of limitations. The statute of limitations for a CPA claim is four years and the statute of limitations for a usury claim is six months after the final payment comes due or the principal is fully paid, whichever is first. RCW 19.86.120; RCW 19.52.032. Ms. Huggins' action was commenced on February 11, 2005, which is over four years after Mr. McQueen quitclaimed his lots to TLI. Relying on the discovery rule, Ms. Huggins' only response is a statement by her attorney that "[i]t is hereby asserted that there is a question of fact as to when Mr. McQueen or his estate had knowledge of these claims against defendants." Pl. Resp., docket no. 21, at 10. This statement is insufficient to avoid dismissal upon summary judgment. Ms. Huggins provides no factual declaration to support her contention that notice of the claims could have occurred less than four years ago. Indeed, there is no reason to believe discovery of the claims occurred after Mr. McQueen quitclaimed his property to TLI. Ms. Huggins' claims against TLI must be dismissed with prejudice because she is not the real party in interest and they are barred by the statute of limitations.

### 3. Lyle Clark

Mr. Clark owned four lots in TLV, two of which he quitclaimed to TLI as payment for membership dues and late fees in June 2000. Mach Decl., at Ex. E. Once again, the

ORDER 8−

Defendants rely on the statute of limitations to defeat Mr. Clark's claims regarding the two lots he transferred to TLI. Mr. Clark's attorney offers the same "discovery rule" response to the Defendants' statute of limitations defense. As with Ms. Huggins, there is no factual support for this argument and no reason to believe it has any validity. Accordingly, Mr. Clark's claims arising out of the two lots he quitclaimed to TLI in June 2000 must be dismissed with prejudice.

### 4.     The Plaintiffs' Remaining State Law Claims

Defendants move for dismissal with prejudice of Mr. Clark's state law claims for the lots he continues to own, as well as the claims of the Tuthills and the Howeys. These claims, including the question of damages, continue to involve genuine issues of material fact based on the record before the Court. Accordingly, the Defendants' motion for summary judgment is denied in part as to those claims. Further, the Court declines to exercise continued supplemental jurisdiction over these remaining claims, which are therefore dismissed without prejudice.

## CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment, docket no. 12, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to (1) all of Plaintiffs' RICO claims under 28 U.S.C. § 1962, (2) all of the claims by William Looney and Peggy Ann Huggins, and (3) all of the claims by Lyle Clark arising out of the two lots that were quitclaimed to TLI in June 2000. These claims are DISMISSED WITH PREJUDICE. The motion is DENIED as to Plaintiffs' remaining claims, which are DISMISSED WITHOUT PREJUDICE, as the Court DECLINES to exercise further jurisdiction over this case.

ORDER  9–

IT IS SO ORDERED.

DATED this 10th day of November, 2005.

_____
Thomas S. Zilly
United States District Judge

ORDER 10–